## MOHR vs. TULIP.

GUARDIAN'S SALE OF REAL ESTATE: MORTGAGE OF LUNATIC    *(1, 2)* *When county court acquires jurisdiction to license sale. (3) When ward not estopped. (4) When he must repay purchase money. (5) When lunatic's mortgage voidable, and how avoided.*

1. A guardian's petition to the county court for license to sell real estate of his lunatic ward, stated that the goods, chattels, etc., in his hands were insufficient to pay all the ward's debts with charges of managing the estate; that such debts and charges amounted to "a sum between two and three thousand dollars more than the personal estate" in his hands; and that in his opinion it would be necessary to use the whole or the greater part of the ward's real estate in order to pay said indebtedness; and it gave "a description" of such real estate, by specifying the several lots or pieces of land, with the number of acres in each. It did not state the amount of personal property which had come to the guardian's hands, nor how much of it remained undisposed of, nor the items of indebtedness, nor the condition or value of the several pieces of land mentioned, nor the fact that a portion of the same constituted the ward's homestead; and the guardian's signature, though affixed to the petition, was not affixed to the annexed *jurat*. *Held*, that the petition was sufficient in substance to call into exercise the power of the court; and if the subsequent proceedings had been regular, the sale of the real estate would not be avoided for the defects of the petition.
2. The statute requires that the order to show cause why the guardian of a lunatic shall not be licensed to sell the ward's real estate, "shall be pub-

Mohr vs. Tulip.

lished *at least four successive weeks* before the day appointed for showing cause." R. S., ch. 94, secs. 4, 48. Where the interval between the day on which such an order was first published and the day appointed for the hearing (including both days named) was two days less than four weeks: *Held*, that the county court *did not acquire jurisdiction* to grant the license, and the sale was void.

3. After the commission of lunacy in his case was superseded, plaintiff, with the aid of counsel, examined the guardian's accounts, settled with him, and received and retains the balance found due on such settlement; and such accounts showed the sale of the land in question to defendant, and payment therefor to the guardian. *Held*, that plaintiff is *not estopped* by the facts from now claiming that the sale of the land was invalid, though he cannot now open or impeach the settlement.

4. Upon defendant's showing, however, that he purchased the land at the guardian's sale in good faith, for a valuable consideration, without notice of defects in the proceedings, supposing that he was getting a perfect title, and has paid taxes and made valuable improvements thereon, plaintiff, as a condition of recovering the land (with the value of the use thereof, exclusive of the improvements), will be required to refund the purchase money, with interest, and the sums paid for taxes, and to pay for the permanent improvements. *Blodgett v. Hitt*, 29 Wis., 169.

5. Plaintiff was duly adjudged a lunatic in 1854, and a guardian appointed; but the latter resigned his trust the next month, and no other guardian was appointed until September, 1869. During the interval, plaintiff and his wife mortgaged all his lands to one J., and the mortgage was foreclosed (the summons in the action being served on plaintiff and his wife). J. bid in the lands at the foreclosure sale, and took a sheriff's deed, which was recorded. In August, 1869, J. commenced an action to recover possession of the land, but discontinued it upon plaintiff's guardian agreeing to pay him the amount claimed to be due him, out of the proceeds of the sale of plaintiff's real estate to be made by the guardian under the license here in question; and J. quitclaimed the several parcels of land to the purchasers at such guardian's sale, and on the same day quitclaimed the whole land to plaintiff. *Held*,

(1) That the mortgage executed by the lunatic, after inquisition found, was voidable, if not void; and this, whether the mortgagee had or had not knowledge of his unsoundness of mind at the time.

(2) That plaintiff, by his settlement with the guardian, ratified the acts of the latter in discharging such voidable contract with J.

(3) That defendant, as a mere voluntary grantee of J., acquired no equities as against the plaintiff, by J.'s deed.

RYAN, C. J., took no part in this decision.

APPEAL from the Circuit Court for *Walworth* County.

Ejectment. The answer, in addition to a general denial, relied upon the following facts: On the 6th of February, 1854, the plaintiff was by the county court of said county adjudged to be a lunatic, and one Gaston was duly appointed guardian of his person and property, and qualified and entered upon his duties as such. Afterwards, about March 10, 1854, Gaston resigned said office, and his resignation was duly accepted by said county court. Plaintiff remained a ward of the court, without any guardian, until about November 9, 1869, when one Church was by said county court duly appointed guardian of his person and property, and duly qualified and entered upon the duties of the office. Before such appointment of Church, an action of ejectment had been commenced in the circuit court for said county, and was there pending at the time of such appointment, by one Jefferson against *Mohr*, the present plaintiff, to recover possession of several parcels of land formerly owned by *Mohr*, including the premises here in controversy. Jefferson claimed, in that action, to own said lands by virtue of a sheriff's deed, dated November 29, 1862, made upon a sale under a judgment in a mortgage foreclosure suit, wherein said Jefferson was plaintiff and said *Mohr* was defendant. Church, as guardian of *Mohr*, appeared and answered in said ejectment suit; and afterwards, to wit, about April 1, 1870, the suit was compromised and discontinued pursuant to a written agreement of the parties, by which Jefferson, in consideration of receiving about $2,200, agreed to sell and reconvey said premises to *Mohr;* and *Mohr*, by his guardian, agreed to pay Jefferson the sum named, within a reasonable time, and interest thereon until paid. Afterwards, about January 2, 1871, the county court made an order in terms authorizing said guardian to sell the real estate of the lunatic, including the premises here in question, and he sold the latter under such order, on the 16th of February, 1871, to the de-

fendant, for $1,004, which sum the defendant afterwards paid said guardian as purchase money of the land. The sale was confirmed by the county court; and the guardian executed and delivered to defendant a deed of the premises, in which the plaintiff's wife joined. Afterwards, about April 3, 1871 (for the purpose, as the answer avers, of assuring to the purchasers at said guardian's sale a more perfect title to the premises purchased by them respectively), said guardian, "at the request of the purchasers, and in consideration of the purchase money paid by them for said premises," procured from Jefferson and wife a quitclaim deed to *Mohr* of all the real estate so sold; and at the same time, and for a like purpose, Jefferson and wife conveyed by quitclaim deeds to said purchasers the several parcels of land so purchased by them. Out of the proceeds of said sale, the guardian paid to Jefferson the sum stipulated to be paid him as aforesaid; and the residue of the moneys arising from such sale he is alleged to have expended for the benefit of the estate of such lunatic, under the order of said county court. In April, 1874, *Mohr* was by said court adjudged to be of sound mind, and the commission of guardianship revoked; and thereupon Church made a full and final settlement of his accounts as guardian, with *Mohr*, in person and by attorney and before the county court, paid over to *Mohr* the balance found due him, and took his receipt therefor.

The answer further averred that defendant owned and occupied the premises as a purchaser in good faith and for a valuable consideration, without notice of any irregularities or defects in the proceedings or deeds of conveyance under which he claimed title; and that he had paid considerable sums for taxes and assessments, and made valuable improvements on the premises; and it prayed for a judgment dismissing the complaint, etc.

On the trial, after plaintiff had shown his title, and that the premises in controversy were his homestead up to the time of

the guardian's sale under which defendant claims, defendant, among other things, put in evidence the proceedings of the county court by which plaintiff was adjudged a lunatic, including the appointment of Church as guardian, in 1869. He then offered in evidence the proceedings in said court relating to said guardian's sale, which were received against objection. The petition of the guardian for a license to sell, dated October 24, 1870, stated, 1. That the goods, chattels, etc. in his hands were insufficient to pay all the just debts of said lunatic, with the charges of managing his estate. 2. That such just debts and charges, in the aggregate, amounted to "a sum between two and three thousand dollars more than his personal estate in the hands of said guardian." 3. That in the petitioner's opinion it would be necessary to use the whole or a greater part of the real estate of said lunatic, in order to pay his indebtedness. It then gave a description of such real estate, as follows:

"The west half of the southwest quarter of section 14, township 1, range
     16    -    -    -    -    -    -    -    -    80
"Northeast quarter of the southwest quarter, same section, less two acres 38
"Lot number 1, on same section, less one acre    -    -    -    64
"Southwest quarter of northwest quarter of section 14, township range 16,
     lot number two, less one acre    -    -    -    -    76
"Lot number 3 and a strip on west side of lot number 4, on same section,
     making in the aggregate 52    -    -    -    -    52"

The petition did not state the amount of personal property which had come to the guardian's hands, nor how much of it remained undisposed of, nor did it specify the items of indebtedness, nor state the condition or value of the several pieces of land mentioned, or the fact that a portion of them constituted the ward's homestead; and the signature of the guardian, though affixed to the petition, was not affixed to the *jurat* annexed thereto.

The record seems to contain *two* orders for a hearing of the guardian's petition, both bearing date November 21, 1870, and

both signed by the county judge. By the terms of the first, as shown by the copy put in evidence by the defendant, the day set for the hearing was " the 2d day of January, 1870; " while by the second it was " the 2d day of January, 1871, at 10 o'clock A. M." The order required publication thereof in a certain newspaper "for four successive weeks prior to said day of hearing," and personal service at least fourteen days before said day of hearing thereof, on four persons named as interested in the estate, if residing in the county. The objections taken to the orders were, that the court had no jurisdiction to make them; that the date of hearing appeared to have been altered on the original record; that the order in its first form was defective and irrelevant; and that upon the second there was no indorsement of the time of filing.

Two affidavits of the publication of said order were also introduced: one made July 24, 1874, while the date of the *jurat* in the other was February 23, 1871, and the date of filing indorsed thereon was March 20, 1870. There was also an affidavit made January 2, 1871, by the guardian, of personal service by him of the order upon three of the four persons named as aforesaid, "at least fourteen days prior to the 2d day of January, 1871;" and that, upon diligent search and inquiry, the fourth could not be found in the county.

The remainder of the record of the proceedings in the county court relating to the sale of plaintiff's land, as put in evidence by the defendant, need not be stated here.

For the plaintiff it was shown that the first notice pertaining to the guardian's sale of his real estate was published November 23, 1870; that it bore date November 21, 1870, and fixed the time of hearing for the 26th of December, 1870; that this notice was republished in the same form on the 30th of November and 7th of December; that on the day last named another notice was published for the first time, in the same words as the former, except that the date of the hearing was changed to January 2, 1871; and that

this latter notice was published four weeks in succession, the last publication being on the 4th of January, 1871. Plaintiff also put in evidence an affidavit of publication, which appeared by the indorsement thereon to have been filed in the county court January 2, 1871, showing that the notice or order to which it was attached had been published in the newspaper designated by the order, "for *three* successive weeks, commencing on the 23d day of November, 1870." This order named the 26th of December, 1870, as the day of hearing.

The jury, by direction of the court, found a verdict for the defendant; and, from a judgment on the verdict, plaintiff appealed.*

---

* Ch. 94, R. S., contains the following provisions:

"Sec. 1. When the personal estate of any deceased person in the hands of his executor or administrators, shall be insufficient to pay all his debts, with the charges of administering his estate, his executor or administrators may mortgage, lease or sell his real estate (except the homestead) for that purpose, on obtaining a license therefor, and proceeding therein in the manner hereinafter provided.

"Sec. 2. In order to obtain such license, the executor or administrator shall present a petition to the county court from which he received his appointment, setting forth the amount of personal estate that has come to his hands, and how much thereof, if any, remains undisposed of; the debts outstanding against the deceased, as far as the same can be ascertained; a description of all the real estate of which the testator or intestate died seized, and the condition and value of the respective portions or lots; which petition shall be verified by the oath of the party presenting the same.

"Sec. 3. If it shall appear by such petition that there is not sufficient personal estate in the hands of the executors or administrators to pay the debts outstanding against the deceased, and the expense of administration, and that it is necessary to sell the whole or some portion of the real estate for the payment of such debts, the county court shall thereupon make an order directing all persons interested in the estate to appear before him at a time and place therein to be specified, *not less than six weeks* and not more than ten weeks from the time of making such order, to show cause why a license should not be granted to the executor or administrator applying therefor, to mortgage, lease or sell so much of the real estate (except the homestead) of the deceased as shall be necessary to pay such debts.

"Sec. 4. Every such order to show cause shall be published *at least four*

Mohr vs. Tulip.

Briefs were filed by *Cotzhausen, Sylvester & Scheiber* for the appellant, and *H. S. Winsor*, with *Fuller & Harkness* of counsel, for the respondent; and the cause was argued orally by *F. W. Cotzhausen* for the appellant, and *Robert Harkness* for the respondent.

For the appellant it was contended, that the petition for leave to sell was fatally defective by reason of the omissions specified in the foregoing statement, and because the descrip-

---

*successive weeks*, in such newspaper as the court shall order, and a copy thereof shall be served personally on all persons interested in the estate, and residing in the county in which such application is made, at least fourteen days before the day therein appointed for showing cause.

" Sec. 48. When the goods, chattels, rights, and credits in the hands of *the guardian of any .... insane person ....* shall be insufficient to pay all the just debts of his ward, with the charges of managing his estate, the guardian may be licensed by the county court of the county in which such guardian was appointed, to mortgage, lease or sell his real estate for that purpose, *in like manner and upon the same terms and conditions as are prescribed in this chapter in the case of a sale by executors or administrators*, excepting in the particulars in which a different provision is hereinafter made.

" Sec. 52. All those who are next of kin and heirs apparent or presumptive of the ward, shall be considered as interested in the estate, and may appear as such and answer to the petition of the guardian; and when personal notice of the time and place of hearing the petition is required to be given, they shall be notified as persons interested, according to the provisions respecting similar sales by executors and administrators, contained in this chapter.

" Sec. 62. In case of an action relating to any estate sold by an executor, administrator, or guardian, in which an heir or other person claiming under the deceased, or in which the ward or any person claiming under him, shall contest the validity of the sale, it shall not be avoided on account of any irregularity in the proceedings, provided it shall appear:

" 1. That the executor, administrator, or guardian *was licensed to make the sale by the county court having jurisdiction.*

" 2. That he gave a bond which was approved by the judge of the county court, in case a bond was required upon granting a license.

" 3. That he took the oath prescribed in this chapter.

" 4. That he gave notice of the time and place of sale as in this chapter prescribed; and

" 5. That the premises were sold accordingly, and the sale confirmed by the court, and that they are held by one who purchased them in good faith."

tion of the real estate is vague and uncertain.  2. That the order to show cause why license should not be granted, was fatally defective.  (a) It is dated November 21, 1870, and calls for a hearing on January 2, 1870.  *Blodgett v. Hitt*, 29 Wis., 169.  (b) As first made, it called for a hearing on December 26, 1870.  On or about the 7th of December, 1870, the order and the record were changed by erasure.  This was equivalent to vacating the original order and making a new one.  *Servatius v. Pickel*, 30 Wis., 507.  (c) The hearing was fixed for a day less than six weeks from the time of making such order.  (d) The order does not except the homestead of the lunatic.  (e) It contemplates a sale of *all* the real estate, whereas the statute provides for mortgaging, leasing or selling only so much as may be necessary to pay the debts.  3. That the proof of publication and service was fatally defective.  (a) The day of hearing in the printed notice is not in conformity to the order and record of the court.  (b) The affidavit of publication *upon which the court acted*, is that dated January 2, 1871, which only shows a publication for *three* weeks; and the affidavits of later date, sought to be substituted for this, are a fraud upon their face.  (c) It appears from all the affidavits that the order was not published " at least four successive weeks " before the day set for the hearing.  4. That by the uniform course of decision in this state, it is settled that the notice of the hearing is jurisdictional, and want of due notice fatal to the whole proceeding.  *Humes v. Cox*, 1 Pin., 551; *Gibbs v. Shaw*, 17 Wis., 197; *Blodgett v. Hitt*, 29 id., 176; *Chase v. Ross*, 36 id., 267; *Foster v. Hammond*, 37 id., 185.  In California, under a statute very similar to ours, the same doctrine is fully established.  Counsel urged numerous other objections to the validity of the sale.

The argument for the respondent was in substance as follows:  1. The petition of the guardian for license to sell the real estate of his ward, though not in strict compliance with the statute, gave the county court jurisdiction.  *Reynolds v.*

*Schmidt*, 20 Wis., 374. The proceeding was *in rem*. Free-
man on Judgments, § 609. The publication of the notice
having been made in fact, the county judge could permit the
proof to be filed at any time afterward; and jurisdiction was
not lost because the evidence of such publication was not be-
fore the court. *Moyer v. Cook*, 12 Wis., 335; *Bacon v. Bas-
sett*, 19 id., 45; *Northrup v. Shephard*, 23 id., 513. The
dates, January 2, 1870, for the hearing, and March 20, 1870,
for the filing of the affidavit of publication, are manifestly
mere clerical errors, which could be corrected at any time,
could mislead no one, and may be deemed corrected. The
published notice of the hearing gives the year correctly. The
notice of hearing was published about two days less than four
weeks; but the court had previously acquired jurisdiction of
the *res*, and this subsequent irregularity did not oust that jur-
isdiction. R. S., ch. 94, sec. 62. The description of the land
is sufficiently certain, so that the sale cannot be avoided in
these collateral proceedings. 2. The owner of a homestead,
with his wife's consent, may sell it at any time. If he is ad-
judged insane, the guardian takes his place in the management
and disposition of the estate, and, with the assent of the wife
manifested by signing the deed, and with the approval of the
court, may make a voluntary sale of the homestead. The
guardian acts in a capacity very different from that of execu-
tor or administrator. The latter manages the property as the
trustee of creditors, and a sale to pay debts is a forced sale.
The guardian acts for a living owner, and, so far as he repre-
sents the owner, acts as his agent and trustee; and a sale made
by him and approved by the court, is a voluntary sale of the
owner. 3. Plaintiff is estopped by his settlement with the
guardian and receipt of the balance found due him; the ac-
counts plainly showing the sale of this land to defendant and
payment therefor to the guardian. *Duchess of Kingston's
Case*, 2 Smith's L. C., notes on pp. 669, 670, and cases there
cited; cases cited by Dixon, C. J., in 24 Wis., 445; *Deford v.*

*Mercer*, 24 Iowa, 118; *Karber v. Nellis*, 22 Wis., 215; *Emmons v. Milwaukee*, 32 id., 435. 4. The judgment of foreclosure and deed to Jefferson were valid. *Sternberg v. Schoolcraft*, 2 Barb., 153; *Crippen v. Culver*, 13 id., 424. And the quitclaim deed from Jefferson to the defendant conveyed the legal title to the latter.

Cole, J. It is apparent that many of the errors or irregularities relied on in this case to annul the sale made by the guardian are cured by sec. 62, ch. 94, R. S. That section declares that the sale shall not be avoided for mere irregularities, providing certain facts exist or appear. This curative provision has already received some consideration in *Reynolds v. Schmidt*, 20 Wis., 374; *Blackman v. Baumann*, 22 id., 611; and *Chase v. Ross*, 36 id., 267. It applies to the present case, and does away with some of the objections taken to the regularity of the proceedings in the county court, so far as regards the validity of the sale in this collateral inquiry.

It is insisted on the part of the plaintiff, that the petition for a license to sell is fatally defective, and does not contain the essential facts necessary to be stated in order to authorize the county court to grant a license to sell real estate. The petition may be defective in some particulars, but it is sufficient in substance to call into exercise the power of the court. If the proper notice had been given for persons interested in the estate to appear and show cause why a license should not be granted, the sale could not be avoided on the ground that the petition was informal, or not as full in some of its statements as it should have been.

But the fatal defect in the proceedings is, that the required notice was not given of the hearing of the application for a license. Such a notice was in the nature of process to bring the proper parties before the court, and was essential to confer jurisdiction over the proceedings upon the county court. This is plainly the result of the decisions of this court, so far

as it has had occasion to consider the effect of not giving such notice in these proceedings, or to pass upon analogous questions relating to the jurisdiction of probate courts in these matters. (See *Sitzman v. Pacquette*, 13 Wis., 292; *Gibbs v. Shaw*, 17 id., 197; *Blodgett v. Hitt*, 29 id., 176; *McCrubb v. Bray*, 36 id., 333; *Reynolds v. Schmidt; Chase v. Ross*, *supra*.) The settled doctrine of this court is, that the required notice for parties interested in the estate to appear must be given; that this is a matter going to the jurisdiction of the court.

In respect to the question before us, the statute provides, in substance, that in case of the insufficiency of the personal estate in the hands of the guardian of an insane person to pay the just debts of the ward, the guardian may be licensed by the proper county court to sell the lunatic's real estate for that purpose, " in like manner and upon the same terms and conditions as are prescribed in " the chapter in case of a sale by an executor or administrator, excepting in the particulars in which a different provision is made. (Sec. 48, ch. 94.) This evidently contemplates the giving of a like notice where an application for a sale is made by the guardian of a lunatic, as in case of a sale made by an executor or administrator. The words " in like manner and upon the same terms and conditions " are broad enough to cover the whole proceedings. (See also sec. 52.) In case of an application by an executor or administrator for license to sell real estate, the county court is required (sec. 3) to make an order directing all persons interested in the estate to appear before it at a time and place therein specified, not less than six and not more than ten weeks from the time of making such order, to show cause why a license should not be granted. By sec. 4 it is provided that " every such order to show cause shall be published at least four successive weeks " in such newspaper as the court shall order, and a copy thereof shall be served personally on all persons interested in the estate and residing in the county in

which such application is made, at least fourteen days before the day therein appointed for showing cause, provided," etc. The order for the hearing of the petition bears date November 21, 1870, and, as recorded, directs a hearing on the 2d of January of the same year. The first publication of the notice in the newspaper designated in the order was on the 7th day of December, 1870, and gave the right year for the hearing of the application. But it will be observed from the dates that the notice was published two days less than four weeks, if both the day of the first publication and the day of hearing are included. The statute is clear, positive and mandatory, that the order "*shall be published at least four successive weeks*" before the day appointed for showing cause, which confessedly was not done in this case. The question then arises, Was not this failure to give the statutory notice a fatal defect in the proceeding? Upon the rule laid down in the above decisions, the question must receive an affirmative answer. There is no possible escape from this conclusion, unless the position of the learned counsel for the defendant is correct, namely, that the court had previously acquired jurisdiction of the *res*, under a sufficient petition, and the failure to give the notice did not oust that jurisdiction. But obviously this view cannot be adopted without departing from the rule laid down by this court on the subject. For it has been held, whenever the question has arisen, that, to confer jurisdiction over the proceeding, notice according to the requirements of the statute must be given to the persons interested in the estate, otherwise the sale cannot be sustained even in a collateral action. Nor is there anything in conflict with these views in the case of *Reynolds v. Schmidt.* There the sole objection to the validity of the sale was founded upon the omission of the administrator to state in his petition the *value* of the personal property which came to his hands; and it was insisted that this was a fact which went to the jurisdiction of the court. But the position was overruled.

The record showed that proper notice of the hearing of the application was given, and this court held that, the probate court having acquired jurisdiction of the proceeding, the sale under the statute must be sustained. That case, however, furnishes no authority for sustaining this sale, and is in harmony with the other cases. Upon the whole case there would seem to be no middle ground between holding that the statutory notice must be given or the sale will be invalid, and holding that in a proceeding by the guardian of a lunatic to sell the real estate of his ward, notice of the hearing of the application may be entirely dispensed with. The latter view would certainly be in conflict with the doctrine established by this court, and cannot, therefore, be sanctioned. It results from this that the sale made by the guardian was invalid on account of the failure to give the necessary notice of the hearing of the application.

After the commission of lunacy had been superseded, the plaintiff with the aid of counsel examined the guardian's accounts, settled with the guardian, and received and retains the balance found due him on such settlement. The accounts showed the sale of the land in dispute to the defendant, and payment therefor to the guardian. It is insisted by the counsel for the defendant, that, by the receipt of the balance found due on settlement with the guardian, the plaintiff is estopped from claiming the land. He ought not, it is said, to retain a part of the proceeds of the sale, and at the same time seek to avoid the sale. The question therefore arises, whether the plaintiff, by the receipt, on the settlement of the guardian's accounts, of a part of the consideration for which the land was sold, is estopped from showing that the sale was void. Under the circumstances, we are unable to see upon what ground he can be said to be estopped from making that claim. He may well be estopped from opening that settlement or impeaching it in any way. But the money in his guardian's hands certainly belonged to him. When the plaintiff received

and retained it, he but received what was his own. Had the funds remained in the possession of the county court, there would surely be no ground for saying that the plaintiff was estopped by the settlement with his guardian from attacking the validity of the sale. The only effect which should, under the circumstances, be given to the act of settlement and receipt of the money, is to conclude the plaintiff as to those transactions and accounts embraced in the settlement. As to those matters, it may be said he has ratified and confirmed the action of his guardian, with full knowledge of the facts, after he became capable of managing his own affairs. But in view of another consideration now to be noticed, we are unable to hold that the plaintiff is estopped from questioning the validity of the sale; which is this:

The defendant has set up in his answer, and gave his own testimony on the trial to support the averment, that he purchased the land at the guardian's sale in good faith, for a valuable consideration, without notice of any irregularities or defects in the proceedings, supposing he was getting a perfect title to the premises. He claims that he has paid considerable sums of money for taxes, and has made large and valuable improvements on the premises. Under the doctrine laid down in *Blodgett v. Hitt,* the plaintiff cannot recover the land without refunding the purchase money with interest, and all sums paid for taxes, and paying for all permanent improvements. Of course the plaintiff is to be allowed for the use and occupation of the premises, excluding the value of the use of the improvements. The principles upon which the accounts between the parties should be stated are laid down in the *Blodgett case,* and require no further elaboration. But, as the plaintiff is required to pay all moneys, with interest, which the defendant has expended for and upon the premises, there is no ground for the application of the doctrine of estoppel.

But it is further insisted on the part of the defendant, that he has the legal title derived through the foreclosure proceed-

ings of the Jefferson mortgage.    It appears that the plaintiff was declared a lunatic by the county court in February, 1854, and one Gaston was appointed his guardian.  In March of the same year, Gaston resigned his trust as guardian, and no other guardian was appointed until September, 1869.   In 1856, the plaintiff and wife gave a note, and also a mortgage upon all his lands, to one Jefferson, for $555; and in 1859 executed another mortgage to the same party for $300, to secure the payment of a promissory note of that amount.   Subsequently the latter mortgage was foreclosed, the summons in the action being served on the plaintiff and wife in January, 1860.  Jefferson bid in the property at the foreclosure sale, and afterwards took a sheriff's deed, which was recorded in January, 1863.    In August, 1869, Jefferson commenced an action to recover possession of the property; but the action was finally settled and discontinued, the guardian of the plaintiff having agreed to pay Jefferson the amount which the latter claimed to be due him, out of the proceeds of the sales of the real estate which he proceeded to make under the license obtained from the county court.    This arrangement was carried out, and Jefferson, for the purpose of assuring to the purchasers at the guardian's sale a more perfect title, executed quitclaim deeds of the several parcels of land purchased by them respectively at the sale.    At the same time he executed to the plaintiff a quitclaim deed of all the real estate sold at such sale.    And it is claimed that, by virtue of the judgment of foreclosure and deed to Jefferson, and the subsequent quitclaim deed from Jefferson, the legal title of the land in controversy became vested in the defendant.    To the point that the foreclosure proceeding was valid and conclusive upon the lunatic, the counsel for the defendant has referred us to *Sternberg v. Schoolcraft*, 2 Barb. S. C., 153, and *Crippen v. Culver*, 13 id., 424. In the former case the action was upon a judgment recovered upon a promissory note given by a lunatic or an habitual drunkard.    The simple question before the court and decided

was, whether a judgment recovered in a court of law against a person who has been found a lunatic or an habitual drunkard, and whose person and property have been placed in the custody of a committee, was void for that reason; and the court held it was not. *Crippen v. Culver* was an equitable action brought by the committee of a lunatic to recover the value of property levied upon and sold under a judgment and execution obtained by regular process of law against the lunatic alone, after the appointment of a committee, on a just demand, and to which it was not claimed or proved that there was any defense. The relief asked was denied. Each of these cases proceeds upon very narrow grounds, and cannot be said to control the one before us, which is quite dissimilar in its facts. (See *Molton v. Camroux*, 2 Exch., 487; *S. C.* in 4 Exch., 17; *Beavan v. McDonnell*, 9 id., 309; *Young v. Stevens*, 48 N. H., 133.) Here the foreclosure proceeding was upon a mortgage executed by the lunatic after inquisition found. Whether the mortgagee had, at the time, any knowledge of his unsoundness of mind does not appear. But the mortgages were voidable, if not void. 2 Kent, 450; *L'Amoureux v. Crosby*, 2 Paige, 422. The defendant is a mere voluntary grantee of Jefferson, the purchaser at the foreclosure sale. It is fair to assume that Jefferson did not execute the quitclaim deed until he was paid in full by the guardian under the arrangement made. Manifestly the defendant acquired no equities under that conveyance. He stands in the same position as his grantor, whose title might be avoided by the plaintiff upon his restoration to sound mind. (See *Gibson v. Soper*, 6 Gray, 279; *Elliot v. Ince*, 7 De G., M. & G., 475; *Manning v. Gill*, L. R., 13 Eq., 485.) By the settlement, the plaintiff may well be held to have ratified and confirmed the act of his guardian in discharging his voidable contracts made with Jefferson. But it is impossible to hold upon the facts that the quitclaim deed from Jefferson to the defendant conveyed the legal title as against the plaintiff. It is far more consistent with all

legal principles to say that the plaintiff himself took whatever title Jefferson had, by the quitclaim which was executed to him.

It results from these views, that the judgment of the circuit court must be reversed, and a new trial ordered.

*By the Court.*—It is so ordered.

RYAN, C. J., took no part in this decision.